UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| **MICHELE PERKINS**<br>**Plaintiff,**<br><br>v.<br><br>**NEW ENGLAND COLLEGE,**<br>**WAYNE F. LESPERANCE, JR,**<br>**Defendants** | Civil Case No.: _____<br><br>2:23-CV-393 |

## COMPLAINT

NOW COMES plaintiff Michele Perkins, Ed. D., by and through her attorneys, Cleary Shahi & Aicher, P.C., and alleges as follows:

### NATURE OF ACTION

1. This diversity jurisdiction action arises out of defendants' discriminatory employment conduct toward plaintiff because of her gender. Plaintiff was an eminent leader in the field of higher education. As the president of New England College (NEC or College) from 2008 to 2022, plaintiff transformed a little known liberal arts college with a small enrollment into a well-respected institution with popular undergraduate and graduate programs and services, and tripled the enrollment to support a multi-million dollar budget while growing the endowment sixfold.

2. In 2022, plaintiff voluntarily stepped down as the president and chief executive officer of NEC in order to entrust the future of the College to new leadership. Plaintiff continued her contributions to NEC as a Chancellor, a position specifically created for her, and engaged in fund raising and other supportive activities. By virtue of her

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

affiliation with NEC, plaintiff was able to remain active with a number of prestigious organizations in the field of higher education at state, regional and national stages, she served on boards and other panels and was able to promote the interests and reputation of NEC throughout the higher educational community. Plaintiff also continued to serve as a trustee on the NEC board of trustees and in that role attempted to shape NEC's future in line with the mandate of the board and consistent with a vision for growth and services to its student body. In her short tenure as Chancellor from September 2022 to April 2023, plaintiff was tremendously successful in fund raising and her continued support of NEC.

3. In 2022, defendant Wayne F. Lesperance, Jr., DLP, became the interim president and then the president of NEC, a promotion that plaintiff had proposed and supported. Initially Mr. Lesperance did not enjoy the full support of the board and some viewed him as lacking the leadership experience, strength and sophistication needed for the job. Plaintiff nonetheless worked diligently to promote him.

4. Unfortunately, Mr. Lesperance was influenced by others in senior leadership such as James Murtha, Senior VP of Academic Alliances, who harbored longstanding misogynistic attitudes. Mr. Lesperance was persuaded that his leadership shortcomings were because of the comparisons with plaintiff's legacy and success which made him look weak as a man and overshadowed his presidency as long as plaintiff was part of the NEC community

5. Mr. Lesperance and his cohorts decided to eliminate plaintiff by not only ousting her as Chancellor, but to do so in a humiliating and crude manner by an ambush on a zoom meeting attended by others, without notice, without reason, and without exhibiting

any respect or regard for her. Plaintiff was de facto removed from the board of trustees and all traces of her in the higher education community were essentially erased overnight as though she had committed a grave crime and had become persona non grata.

6.      The conduct of these men was consistent with many other instances when they protected and/or promoted men over women at the workplace despite the fact that the men they favored were considerably inferior in skills and professional talents. Had plaintiff been a male past president of the College with her remarkable record, the board chair and College president would have taken her out to lunch at their country club, shared with her their concerns and invited her participation in shifting of resources to keep her happy with a sense of respect and professional standing intact. Instead these men treated plaintiff like the "enemy" which in their misogynistic world was the case. Plaintiff was not even afforded the employment policies and rules extended to all staff including notice and warning.

7.      Defendants' scheme was intended to demoralize plaintiff and professionally decapitate her so that she was unequivocally removed from NEC as well as the higher education community at large. Defendants knew that the loss of plaintiff's status at NEC deprived her of the necessary qualification to remain on the many boards and organizations that influence higher education. Against the backdrop of a trend in American management to recognize and promote women in all professions and walks of life, Mr. Lesperance and his cohorts felt they had to be particularly ruthless in their treatment of plaintiff to silence her and avoid public awareness of the discriminatory conduct and illegal scheme against a woman leader. The planning was made well in advance of plaintiff's termination and included the legal strategy of making all contract payments to eliminate plaintiff's ability to claim damages

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

for breach. Defendants' conduct was the result of ill will and actual malice, and warrants the imposition of punitive damages.

## THE PARTIES

8. Plaintiff Michele Perkins, Ed. D., is an individual who at all relevant times herein was and continues to be a resident of the town of Corinth Corners, Orange County, Vermont.

9. Defendant New England College (NEC) at all relevant times herein was a New Hampshire Domestic Non-profit Corporation with its principal place of business at 98 Bridge Street, Henniker, New Hampshire.

10. Defendant Wayne F. Lesperance, Jr., DLP, at all relevant times herein was and continues to a resident of the State of New Hampshire. In 2022, defendant Lesperance became the president of defendant NEC.

## JURISDICTION

11. This Court has diversity jurisdiction under 28 U.S.C. §1332. The amount in controversy is well in excess of the jurisdictional requirement of $75,000, exclusive of interest and costs. Venue is proper in this Court under 28 U.S.C. §1391(b)(1) and (2).

## FACTS

12. In March 2001, plaintiff started her career at NEC as a consultant to address the serious difficulties and challenges in enrollment and instability that the college faced at the time. By June 2001, plaintiff was offered the position of V.P. of Enrollment which she accepted. Plaintiff worked diligently to revise the organization, improve the technology, broaden outreach, and redesign all recruitment publications. She enrolled 305 student in Fall

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

2002 (a 13% increase) while reducing institutional discount by 7 percentage points. Plaintiff also worked on the graduate program which was in a state of stagnation. She launched an MFA in Creative Writing, added a hybrid (online/onsite) Healthcare Administration concentration to the MS in Business, and began to promote the MEd. Plaintiff started marketing outside of New England. As a result of her efforts, there was an approximately $3 million turn around from a $2.5 million deficit to a budget surplus of approximately $350,000 in FY 2003.

13. In the academic year 2003-2004, plaintiff's efforts resulted in more growth, increased undergraduate enrollment to 340 new students and the continued climb of graduate revenues. Plaintiff was recognized for her work by promotion to the position of Senior V.P.

14. By January 2007, plaintiff had not only continued her efforts to promote and grow NEC but had managed to complete her doctorate work at the prestigious University of Pennsylvania's Executive Doctorate in Higher Education. She was promoted to the position of Interim President and in March 2007 successfully defended her dissertation with distinction at Penn.

15. Despite facing a number of challenges, plaintiff managed to beat two male applicants for the position of President and was offered the permanent job in October 2008. Shortly thereafter, plaintiff secured a $100,000 gift from an alumna, began to work on a new strategic plan, a new facilities plan, and a plan for a capital campaign, the first-ever in the College's history with a goal of $20 million.

16. During the years 2009-2011, plaintiff secured funding for a $1.5 million project that included the College's first turf field and improvements to parking. She developed a five-year strategic plan that included funding to renovate and construct new buildings for classrooms, a theater, and a new athletic center.

17. During the period of 2011-2013, plaintiff became more active in state, regional, and national organizations as part of her goal to expand the positive visibility of the College. She was invited to speak or lead sessions at conferences. Plaintiff became the vice chair of the New Hampshire College and University Council (comprised of all NEASC-accredited institutions in the state). She was appointed to the New Hampshire Commission of Higher Education as a Commissioner. Plaintiff became active in the Council of Independent Colleges and the National Association of Independent Colleges and Universities. Plaintiff continued to grow the college facilities and acquired the antique train depot in Henniker that was fully renovated into an office building.

18. In the years 2013-2015, plaintiff continued to grow college enrollment, the graduate program, obtain pledges in high six-figures for the renovation and construction projects, grow NEC's endowment including successfully negotiating a teach-out agreement with Chester College. Plaintiff grew the board of trustees and promoted a more professional board with trustees who contributed financially to the College. Plaintiff was appointed to the Board of the Council of Independent Colleges, and joined the Board of the New England Council. She become the vice-chair of the New Hampshire Higher Education Commission.

19. In FY 2015, plaintiff was able to overcome a $150,000 shortfall in the annual $500,000 budget surplus expected by the board. Plaintiff proceeded to launch the quiet phase

of the capital campaign and obtained several seven-figure pledges, and numerous six-figure pledges. The classroom building, 19,000 square feet, was designed and built. Plaintiff obtained a seven-figure, foundational pledge from a donor for a new theater. She obtained a $2.5 million pledge from a private foundation to support the online programs. The College applied for, and was awarded a $2.3 million federal Title 3 grant. Plaintiff obtained a Harriman Foundation grant of $400,000, and a Davis Grant of $200,000. She was appointed to the Executive Committee of the Board at the Council of Independent Colleges, and elected by her peer presidents to serve on the Board of the National Association of Independent Colleges. Plaintiff was subsequently invited to join the Executive Committee of NAICU.

20. During the years 2017-2019, the College entered the public phase of the funding campaign. The initial goal of $20 million was well exceeded and increased to $40 million, with the campaign completing in 2020. Plaintiff had obtained multiple 7-figure gifts; there had been only one 7-figure gift in the entire history of the College before plaintiff became president.

21. By the end of 2017, NEC had acquired the New Hampshire Institute of Art which grew the College's endowment to $30 million—it was $5 million when plaintiff became president.

22. In Fall of 2018 the College enrolled the largest incoming (traditional) class in its history. In Fall of 2019, the College enrolled over 500 new students, surpassing the previous record significantly. Additionally, largely through plaintiff's efforts to expand markets outside New England, NEC became the most ethnically/racially diverse college in New Hampshire. Marketing and recruitment took place at states such as Florida, Texas,

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

7

California, Baltimore/DC, and parts of the South. The international enrollment burgeoned. The College began construction of the new theater, the Rosamond Page Putnam Center for the Performing Arts, in 2018. It was completed in early 2020. The College was in the best shape in its history in terms of enrollment, campus quality, endowment, and positive visibility.

23. With the arrival of the pandemic in 2020, the College faced many challenges including dropping enrollments. Plaintiff hired Karen Scolforo to take over from Brad Poznanski to lead the traditional admissions division. Ms. Scolforo suggested a new type of nursing program in partnership with area hospitals. Jim Murtha had been unable to provide any options relative to this idea. Despite the early success of Ms. Scolforo's idea and increased enrollment for Fall 2023, Wayne Lesperance fired her and, with the aid of James Murtha, reinstalled Mr. Poznanski as the head of admissions.

24. In late 2021, the director of campus safety, a man who was the subject of complaints of bullying, reportedly referred to plaintiff in lewd, sexual terms. Plaintiff brought this to the attention of James Murtha who was responsible for this individual, and even though eventually this man ceased employment for the College, Mr. Murtha defended him and resisted terminating him.

25. In summer 2022, plaintiff advised Wayne Lesperance and James Murtha that the College CFO, Paula Amato, had been approved by the board for a title change and pay raise. Both men became angry and did not want a woman colleague to be so recognized.

26. Effective September 1, 2022, plaintiff voluntarily stepped down from her position as president and chief executive officer, and started working as the Chancellor for NEC under a contract (Employment Agreement). Her one-year written Employment

Agreement provided that plaintiff reported to the College president. The Employment Agreement provided that plaintiff would work remotely from her residence in Vermont. Plaintiff's salary was paid to her in Vermont subject to Vermont withholdings. The Employment Agreement further provided that plaintiff's service as a trustee on the board for the balance of her elected position to June 30, 2025, was separate and independent of her employment as Chancellor. It was generally understood that plaintiff's willingness to become the Chancellor and use her influence and contacts to fund raise and otherwise support the College was a significant benefit to the College and it was welcomed for as long as plaintiff wished to devote her time to such work as Chancellor.

27. In 2022, Dr. Perkins suggested to Lesperance and Murtha that a former employee, Carol Thomas (who as VP had enrolled the two largest incoming classes in the history of the College) be engaged as a consultant to assist with admissions strategies. Without any valid reason, Murtha opposed Ms. Thomas and even threatened to quit if she was hired. Lesperance who is highly influenced by Murtha, refused to engage Carol Thomas.

28. Shortly after a board meeting in February 2023, plaintiff spoke with Wayne Lesperance about a matter that concerned her, namely, at the meeting James Murtha sat at the head of the board table beside Wayne Lesperance, the board Chair, and the Vice Chair. Plaintiff explained the impression conveyed was that Mr. Murtha held a special place as Wayne Lesperance's #1 if not a trustee, and this arrangement could be upsetting to other senior leadership such as Paula Amato.

29. In winter 2023, plaintiff also encountered curious shortcomings by Mr. Lesperance. Plaintiff had a reliable verbal pledge of $1 million for the new athletic center.

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

The donor was someone she had worked with for many years and had a very positive relationship. Plaintiff informed Mr. Lesperance that as long as she had some schematics for the athletic center renovation, she could yield the pledge. However, plaintiff never received any drawings as though Mr. Lesperance did not wish her to succeed with her fund raising. Plaintiff was also privy to an exciting opportunity for collaboration between the College and a nationally known high tech company but Mr. Lesperance made little effort to set up a meeting with a contact at the company to explore the opportunity.

30. In addition to plaintiff's charge as chancellor to fund raise, the College actually had a position for such activity. The VP of Advancement, a job given to Bill Deptula was responsible for fund raising but was completely inept and unwilling to exert himself including travel to meet with donors. Lesperance acknowledged that something had to be done about Mr. Deptula but noted the Board Chair, Lex Scourby, liked Mr. Deptula, adding "Lex won't let me fire Bill."

31. On Wednesday March 29, 2023, plaintiff met with Mr. Lesperance to discuss a number of items such as enrollment, fund raising and his plans for a football program. Mr. Lesperance thanked plaintiff at the end of the meeting for her great work. Plaintiff was puzzled by the fact that a grand piano and a handmade poster bed she had donated to the College and placed in the V.P. guesthouse were missing. At the time the guesthouse was occupied by Murtha. Mr. Lesperance casually commented they were discarded.

32. On the following Tuesday, April 4, 2023, plaintiff was invited to a zoom meeting with Mr. Lesperance but was not told the agenda. Her inquiry went unanswered. At the meeting attended by James Murtha, Paula Amato, Lex Scourby and Wayne Lesperance,

plaintiff was startled, shocked, embarrassed, and highly offended when Mr. Lesperance announced she was fired and that "it's just not working out." No substantive reason was given for the bizarre decision to terminate plaintiff particularly as there had not been any disciplinary action pursuant to the progressive disciplinary policy applicable to all College employees, and Lesperance had given every indication that he was grateful for the wonderful work done by plaintiff and her contributions. Lesperance indicated the balance of the one-year Employment Agreement would be paid.

33. In a subsequent conversation with Mr. Scourby, the board chair, plaintiff expressed her shock and dismay about the bizarre decision to fire her. Mr. Scourby was not sympathetic and said "Wayne told me you and he were already working on a transition plan." Mr. Scourby also stated that under the circumstances he did not expect plaintiff wished to remain on the board, but plaintiff made it clear that she had no intention to resign from the board. Mr. Scourby nonetheless proceeded to de facto remove plaintiff from the board in violation of the bylaws.

34. Plaintiff's longstanding and remarkable career at NEC was ended by a small group of men in senior leadership who harbor ill will toward women and blame their own shortcomings and incompetence on women whose success they view as somehow not allowing them to realize their full potential. By terminating plaintiff, defendants favored Mr. Deptula by granting him the exclusive opportunity to raise funds without having to compete with plaintiff.

### COUNT I - Discrimination in Violation of VFEPA

35. Plaintiff refers to and incorporates her allegations in paragraphs 1-34.

36. By employment of plaintiff in Vermont, defendants are subject to Vermont's Fair Employment Practices Act, Title 21. "The Fair Employment Practices Act, which makes it unlawful for an employer 'to discriminate against any individual because of [her] . . . sex,' 21 V.S.A. § 495(a)(1), is patterned on Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, *State v. Whitingham School Board*, 138 Vt. 15, 17, 410 A.2d 996, 997 (1979); '[t]he standards and burdens of proof under state law are identical to those existing under federal law.' *Cobb v. Dufresne-Henry, Inc.*, 603 F. Supp. 1048, 1053 (D. Vt. 1985). Nevertheless, in contrast to the federal act, jury trials are permitted in actions under the Vermont act; therefore, we need not follow every nuance of federal court pronouncements on Title VII in FEPA actions." *Graff v. Eaton,* 157 Vt. 321, 323, 598 A.2d 1383, 1384 (1991). VFEPA applies to employer's discriminatory decisions not to hire, and imposes liability on both the employer and individual employees such as supervisors. *Payne v. US Airways, Inc.*, 2009 VT 90, ¶ 21, 186 Vt. 458, 471, 987 A.2d 944, 953.

37. Defendants' decision not to renew plaintiff's contract beyond September 1, 2023, was discriminatory because of her sex and a violation of VFEPA. As detailed above, defendants were motivated by their ill will against plaintiff because of her gender and their envy of her success, influence and legacy as a woman leader. By eliminating plaintiff's involvement with NEC, defendants favored a male colleague, Mr. Deptula, as exclusively in charge of fund raising.

38. As a result of defendants' discriminatory and malicious conduct motivated by ill will, plaintiff sustained damages including but not limited to the loss of salary and benefits. Plaintiff was also deprived of her ability to remain active with various organizations and

professional associations in the field of higher education. She suffered harm to her professional reputation and standing. Plaintiff was shocked, humiliated, upset and embarrassed by defendants' conduct. Plaintiff seeks compensatory damages, punitive damages and her attorney's fees as the statutorily allowed measures of recovery for the violation of VFEPA.

### COUNT II - Intentional Infliction of Emotional Distress

39. Plaintiff refers to and incorporates her allegations in paragraphs 1-38.

40. Defendants' plan and scheme to professionally decapitate plaintiff, destroy her legacy and eliminate her presence and influence at NEC as well as the field of higher learning was intended to deliver a knock-out blow to plaintiff, to demoralize her, emotionally inflict a deep wound, and send the message to the community at large that plaintiff had committed a grave wrong, some unspeakable deed, that required her to professionally cease to exist. By not providing plaintiff with a reason for their decision, defendants intended to enhance the negative implications of their actions as those professionally associated with plaintiff and her colleagues would assume the reason for her termination was of such gravity that she could not bring herself to repeat it. Plaintiff was rendered incapable of defending herself against a nonexistent accusation while tainted by the knowledge of some supposed secret, so ugly and severe that could not be publicly repeated. And defendants gave the false impression that the wrong committed by plaintiff was so serious that it justified the end of her career at a time that she was to enjoy the fruits of her many years of having developed professional ties and connections in her chosen profession.

41. Plaintiff was immediately erased from the College website and her name was removed from the list of the trustees on the Board. Her access to the online Board portal was removed. Her College email was terminated with only two days' notice. Dr. Perkins wrote the College to ask them to approve the transfer of her cell phone number to a new, personal account. The College refused to respond. She was ordered to return the College car and to clear out a few remaining items from the barn at the president's house. Many people attempted to reach her but, when calling Lesperance' office, were told that "Dr. Perkins is no longer employed by the College." When asked for her new contact information they were told that they had none.

42. Defendants engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress by plaintiff, actually or proximately caused by the outrageous conduct. Defendants' conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and should be regarded as atrocious and utterly intolerable.

43. As a result of defendants' malicious conduct motivated by ill will, plaintiff sustained damages including but not limited to severe emotional distress, loss of salary and benefits. Plaintiff was also deprived of her ability to remain active with various organizations and professional associations in the field of higher education. She suffered harm to her professional reputation and standing. Plaintiff was shocked, humiliated, upset and embarrassed by defendants' conduct. Plaintiff seeks compensatory and punitive damages.

## COUNT III - UNLAWFUL REMOVAL FROM BOARD OF TRUSTEES

44. Plaintiff refers to and incorporates her allegations in paragraphs 1-43.

45. Plaintiff was de facto removed from the board of trustees in violation of the College bylaws and the procedural requirements for the removal of a trustee. Plaintiff's elected term as trustee was unlawfully interfered with and disrupted as part of the plan to cut her off completely from the affairs of the College and send the false message that she had engaged in such grave conduct that she could no longer remain in College governance.

46. As a result of defendants' malicious conduct motivated by ill will, plaintiff sustained damages including but not limited to severe emotional distress, loss of salary and benefits. Plaintiff was also deprived of her ability to remain active with various organizations and professional associations in the field of higher education. She suffered harm to her professional reputation and standing. Plaintiff was shocked, humiliated, upset and embarrassed by defendants' conduct. Plaintiff seeks compensatory and punitive damages.

WHEREFORE, plaintiff prays for an award of compensatory damages for lost wages (past and future), value of lost benefits, interest and attorney's fees. Plaintiff requests an award of punitive damages for defendants' malicious conduct. Judgment should be entered for plaintiff for the damages sought, compensatory and punitive, interest, attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests trial by jury.

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

Dated this 12th day of September, 2023.

                                        Respectfully Submitted,
                                        CLEARY SHAHI & AICHER, P.C.

By:_____
        Kaveh S. Shahi, Esq.
        110 Merchants Row, Ste. 3
        Rutland, VT 05701
        (802) 775-8800
        kss@clearyshahi.com
        *Attorneys for Plaintiff Michele Perkins*